UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) </br> ) </br> v.     ) </br> ) </br> Ivaylo Hristov,     ) </br> ) </br> Defendant.   ) </br> ) | CRIMINAL NO. 10-10056-PBS |

**MEMORANDUM AND ORDER**

November 4, 2010

Saris, U.S.D.J.

Defendant Ivaylo Hristov is charged with identity theft and other crimes relating to his participation in a scheme of ATM "skimming."[1]  Hristov filed a motion to suppress statements made during a video and audio taped police interrogation conducted on the night of his arrest on January 27, 2010. Hristov argues (1) that he was not properly advised of his <u>Miranda</u> rights; (2) that he did not understand his <u>Miranda</u> rights and therefore did not knowingly and intelligently waive them; (3) that his statement was involuntary because of law enforcement threats or coercion; and (4) that he had invoked his right to counsel.  After a hearing and review of the parties' briefs, the motion is **DENIED**.

---

[1] Defendant is charged with using counterfeit access devices in violation of 18 U.S.C. §§ 1029(a)(1) & (b)(1) (Count 1), bank fraud in violation of 18 U.S.C. § 1344 (Counts 2-3), possession of device-making equipment in violation of 18 U.S.C. § 1029(a)(4) (Counts 4-6), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), (c)(4) & (c)(5) (Counts 7-9).

## I. FINDINGS OF FACT

On January 27, 2010, after investigation, the Quincy police arrested the defendant on charges of unlawful skimming at a Citizens Bank ATM at about 6:12 p.m. on that day.  Hristov was taken to the Quincy Police Department for booking, where the police discovered a number of Dunkin' Donuts gift cards in his possession, all of which had Post-It notes with hand-written numbers affixed to them.  He also had a total of $1,380 in cash on his person, all in $20 bills.

That same night, Hristov was interrogated at the station by two Quincy police detectives, one Milton police detective, and an agent from the United States Secret Service.  Detective Cleary of the Quincy Police Department, after introducing himself and the other people in the room, explained to Hristov that he had "to do a couple things for you, for your own protection; okay?"  DVD 19:35:36, Transcript ("T.") 2.  He confirmed that Hristov spoke English, asking, "Your English is that good that you can understand what I'm trying to tell you?" DVD 19:35:43, T.2.  Hristov responded, "Yeah, so far.  I understand."  Id.  Detective Cleary then read Hristov's Miranda rights out loud from the printed waiver form, stating:

> You have the right to remain silent; okay.  Anything you can say can be used against you in court.  You have the right to an attorney to have him with you during questioning.  If you cannot afford an attorney, one will be appointed to you and at no expense and prior to any questioning.  If you begin to answer questions, you have the right to stop questioning at any time.

DVD 19:36:06, T.2-3. Detective Cleary then began to review the waiver form item by item with Hristov, and was interrupted by Hristov's statement that "I'm not sure if I need a lawyer right now or no." DVD 19:36:45, T.3. In response to this statement, Detective Cleary said, "Okay. Well, I mean, it's entirely up to you. We're just here to talk about -- . . . you can talk about certain things, and, like it says right here, okay, 'If you begin to answer questions, you have the right to stop questioning at any time.'" DVD 19:36:57, T.4. Without reading each of the rest of the <u>Miranda</u> rights individually, Detective Cleary then continued, "Okay. All right. So, do you understand these?" DVD 19:37:08, T.4. Hristov responded "Yeah," <u>id.</u>, and signed the waiver form at Detective Cleary's request. DVD 19:37:17, T.4.

After being orally advised of his <u>Miranda</u> rights and signing a waiver form, Hristov made a statement. He stated that he was born in Bulgaria and is a naturalized Canadian citizen. He eventually admitted using gift cards that had been re-encoded with magnetic strip information that had been skimmed from other cards, that the numbers on the Post-It notes attached to the cards were PINs, and that he was to receive 10% of the money he was able to withdraw from the accounts from one of his associates. Hristov claimed that he was in the Boston area along with two other individuals, "Ivan," a Croatian Serb, and "Valentin," a Bulgarian, and that he did not know their last

names. "Ivan" gave him the cards to use. The entire interrogation was videotaped, and both the video and the transcript of the interview were submitted in evidence.

## II. DISCUSSION

### A. Proper Miranda Rights

Hristov argues that Detective Cleary did not properly advise him of his Miranda rights by failing to completely review the written waiver form with Hristov after Cleary had already read the warnings aloud. This argument fails, in light of the fact that Cleary read Hristov his rights out loud prior to reviewing the waiver form. Cleary confirmed that Hristov understood English and that he specifically understood the rights as they had been read to him. There is no requirement that Miranda rights be delivered more than once. See United States v. Garner, 338 F.3d 78, 81 (1st Cir. 2003) (finding no obligation to repeat Miranda warnings during custodial interrogation when they had been recited twenty minutes earlier at place of arrest). Cleary's efforts to review the form item by item with Hristov went beyond his obligation to state the rights, and the fact that he did not complete this second review is of no import to the propriety of his conduct.

### B. Language Difficulty

Hristov argues that his waiver was not knowing and intelligent because his poor English prevented him from fully

understanding the rights that he was giving up.  To be valid, a waiver of <u>Miranda</u> rights must be made "voluntarily, knowingly and intelligently."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (citing <u>Johnson v. Zerbst</u>, 304 U.S. 458, 475 (1938)).  This means that such waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran</u>, 475 U.S. at 421.  The court must take into account the "totality of the circumstances surrounding the interrogation" to determine whether <u>Miranda</u> rights have been validly waived.  <u>Id.</u> (citations omitted).  The government bears the burden of proving the knowingness and voluntariness of waiver by a preponderance of the evidence.  <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 488-489 (1972); <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).

It is unquestioned that language difficulty can, in some cases, render a waiver invalid.  <u>See</u> <u>United States v. Herendia-Fernandez</u>, 756 F.2d 1412, 1415 (9th Cir. 1985) (noting that "language difficulties may impair the ability of a person in custody to waive [<u>Miranda</u>] rights in a free and aware manner"); <u>United States v. Short</u>, 790 F.2d 464, 469 (6th Cir. 1986) (finding defendant's exceedingly poor grasp of English and ignorance of American judicial system rendered waiver invalid).

Hristov relies primarily on <u>United States v. Garibay</u>, 143

F.3d 534 (9th Cir. 1998).  In that case, the defendant was stopped by a United States Customs Inspector while attempting to cross the U.S.-Mexico border into California.  Id. at 536.  A subsequent search of the car revealed a substantial quantity of marijuana hidden in the trunk.  Id.  About an hour later, United States Customs Agents asked Garibay if he understood English, Garibay said "yes," and the agents proceeded to read him his Miranda rights and question him in English.  Id.  The District Court found knowing and voluntary waiver; the Ninth Circuit reversed, finding that Garibay did not understand the rights he was giving up.  Id.  The court pointed to Garibay's extremely low I.Q., his "inability to understand oral instructions," and his history (gleaned from the testimony people in his community who knew him) of claiming to understand English better than he actually did when faced with authority figures.  Id. at 537-38.

After reviewing the videotape, I find that the waiver was knowing and valid.  Hristov shows no sign of having below-average intelligence, having played an integral part in an ATM skimming scheme that involved the installation and operation of sophisticated technology.  Furthermore, Hristov appears to have a decent, albeit not perfect, grasp of English.  The videotape indicates that Hristov was able to understand and answer most of Detective Cleary's questions without difficulty.  He demonstrated a fairly substantial vocabulary; for instance, he could distinguish between an apartment and a house.  See DVD 19:40:04,

6

T.8 ("DET. CLEARY: That's your address. Is that an apartment? HRISTOV: No, it's a house."). He could also utilize English idiomatic expressions. See, e.g., DVD 20:57:42, T.84 (referring to someone renting an apartment "in my name"). When Cleary asked Hristov if his English was good enough to proceed in English, Hristov replied, "Yeah, so far. I understand." DVD 19:35:45, T.2. Hristov then affirmatively acknowledged that he understood the rights he was read on several occasions. Tellingly, when he did not understand something, he indicated as much. See, e.g., DVD 19:52:20, T.23 ("DET. CLEARY: And you realize when you go to ATM machines that you're going to be on surveillance film; right? Did anybody ever tell you that? HRISTOV: Pardon me? DET. CLEARY: Let me change that word. Yeah, surveillance is a hard word. When you go to a bank or you go to an ATM machine; right? HRISTOV: Yes. DET. CLEARY: To take the cash out, do you know that your picture is being taken? HRISTOV: No."); DVD 20:35:40, T.61-62 ("DET. CLEARY: Can you help yourself and give up this whole story and maybe buy a little leverage, they call it, for yourself, that could happen too. . . . HRISTOV: Sorry. I didn't understand that. Buy what?").

Given the totality of the circumstances, I find that Hristov's oral affirmation that he understood the rights he was read and his subsequent signature on the form, which contains the rights in writing, make it more likely true than not that he waived his rights knowingly and intelligently. See Campaneria v.

7

Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding that, despite defendant's uncontestedly poor grasp of English, his indication that he understood the rights when delivered orally was sufficient for a finding of knowing and intelligent waiver); United States v. Ortiz, 315 F.3d 873, 879-882 (8th Cir. 2003) (finding effective waiver where defendant with limited English stated he understood rights delivered in English); United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997) (same).

### C. Alleged Coercion

Hristov argues further that his waiver was involuntary "because his decision was unduly influenced by the interrogating officers' repeated threats and promises of leniency." Def.'s Mem. 14. The Miranda Court established that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Miranda v. Arizona, 384 U.S. 436, 476 (1966). The Court later clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Suggestions that cooperation might lead to leniency alone rarely constitute coercion. See United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010) ("There were a lot of police officers present and a suggestion that cooperation might induce

leniency, but neither amounts to coercion."). "A promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible." United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985). Instead, courts must "look at the totality of the circumstances, including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne." United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990).

While the officers who investigated Hristov plainly stated that being forthcoming would be in his best interests, they explicitly informed him that they could not make any promises. See DVD 20:34:57, T.61 ("Let me make something clear with you; okay. Whatever we do here tonight, talk about or whatever, I can not promise you anything."). Later, after the Milton detective indicated that Hristov's honesty could inspire leniency in the judge, Hristov demonstrated his comprehension of the situation by saying, "Yeah, but nobody can guarantee that right?" DVD 20:36:54, T.62. Cleary correctly responded, "We can't." Id. No promises were made, and it was made clear that while Hristov could hope for leniency in exchange for cooperation, he understood he could not bank on it. This does not amount to coercion under the constitutional standard as elucidated above.

Of greater concern is the suggestion that Hristov's failure

9

to answer a question might redound to his detriment.  See, e.g., DVD 19:57:20, T.27 ("If you don't want to answer that question, we're going to put that in the report too, and then the judge is going to know that you lied.  Okay?  Or that you weren't truthful with us.  Lying is not a good word; all right.").  The underlined part of the question could be read to improperly threaten Hristov that he would be punished for not answering a question.  However, Detective Cleary immediately clarified that he would tell the judge only if Hristov was not truthful.  Taken in its totality, I find that there was no improper impression left that Hristov would be penalized for not answering questions -- only for lying.

The officers' suggestion that answering questions might lead to judicial and prosecutorial leniency did not rise to the level admonished in United States v. Anderson, 929 F.2d 96 (2d Cir. 1991), on which Hristov relies.  In Anderson, a DEA officer told a defendant at the point of arrest, "'this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us.'" Id. at 97 (alterations in original).  The court used three touchstone factors in evaluating the totality of the circumstances: "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  Id. at 99 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  The court made much of

10

the fact that the effect of the officer's statement was to create "in Anderson's mind a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents." Anderson, 929 F.2d at 100.  This created a false or misleading impression because "it is commonplace for defendants who have acquired counsel to meet with federal law enforcement officials and agree to cooperate with the government."  Id.  In the instant case, no such false impression was created.  While the officers did suggest that cooperation might help his chances with the judge the following morning, the officers never suggested that Hristov would have no future opportunity to cooperate with the police or the prosecution; there was no statement that it was now or never.

   The totality of the circumstances makes this a close question.  Hristov had never been arrested before, was a naturalized Canadian citizen, had an imperfect grasp of English and was in a small room with four police officers.  The interview lasted for about two hours.  The police were tough at times.  For example, playing the "bad cop," Agent Goodwin told the defendant, "We have you *dead to rights,* so you're not helping yourself by lying to us," "You come clean and, guess what, we'll talk to the prosecutor and let them know," "Be straight, *be a man,* stand up, and do the right thing, and tell us what's going on," "We have you, OK?" "I have you, I have your [inaudible], I have everything

11

I need on you - you're done, *unless you start helping us.*" However, the officers did not yell, and even joked with Hristov on several occasions.  He was given water and offered a blanket.  While they did put pressure on Hristov to make a truthful statement, that pressure did not rise to the level of being so coercive as to overturn his will.  See <u>United States v. Harrison</u>, No. 2:07CR53DAK, 2008 WL 4735610 (D. Utah, 2008) (finding no coercion where officer got "a little in [defendant's] face" when defendant denied crimes officer knew he had committed, and officer told defendant that "they had his DNA and if they had to wait for a DNA match, the United States Attorney's office would go for the maximum punishment").  Courts have found police behavior more aggressive than Detective Cleary's or even Agent Goodwin's to be non-coercive for purposes of voluntariness.  <u>See, e.g.</u>, <u>Martin v. Wainwright</u>, 770 F.2d 918, 925 (11th Cir. 1985) (finding no coercion where "police admitted to employing a 'good guy, bad guy' technique," and one officer, "playing the 'bad guy,' raised his voice at [the defendant], cursed him, and discussed the death penalty"), <u>op. modified on den. of reh'g</u>, 781 F.2d 185 (11th Cir. 1986).  Where courts have found that the existence of coercion rendered a statement involuntary, the facts have been far more egregious than in the instant case.  <u>See, e.g.</u>, <u>Doody v. Schriro</u>, 548 F.3d 847 (9th Cir. 2008) (finding waiver involuntary in case where 17-year-old defendant faced

twelve-hour interrogation, demands from officers that he answer questions, and assurances that the interrogation would not end until he confessed); United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) (finding confession involuntary where officer told defendant "she would not see her child for a long time if she did not cooperate" and that he would tell prosecutor that she was "'stubborn or hard-headed' if she refused to cooperate").  In contrast to these cases, Detective Cleary was persistently calm, and reminded Hristov several times of his right to stop questioning at any time.  See, e.g., DVD 19:58:49, T.28 ("So, this is up to you what you want to do.  Because if you don't want to answer, then that's okay.")  The overall tone of the interview, coupled with Detective Cleary's reminders that Hristov had the option to not answer questions, leads me to find that Hristov's waiver was voluntary, despite the presence of some pressure from the officers.

C. Invocation of Right to Counsel

     Hristov further argues that he invoked his right to counsel during the interview, that questioning should have stopped at that point, and that any subsequent statements should be suppressed.  Hristov made four relevant statements over the course of the interview: "I'm not sure if I need a lawyer right now or no," DVD 19:36:57, T.3; "I told you I'm not sure if I - ah - if I'm supposed to talk without lawyer," DVD 19:51:38, T.22; "So, I just want to figure out if I need a lawyer," DVD 19:56:16,

T.26; and "Can I have a lawyer for tomorrow?" DVD 20:37:16, T.63.

Invocation of the right to counsel under the Amendment must be unequivocal. Ambiguous statements do not suffice to trigger the right. See Davis v. United States, 512 U.S. 452, 458 (1994) (noting that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning"). In Davis, the Court found that the statement "Maybe I should talk to a lawyer" was ambiguous, and that police were not obliged to treat it as a request for counsel. Similarly, the Seventh Circuit determined the statement "Is it possible to have a lawyer here?" to be equivocal and not sufficient to require police to stop questioning. Jackson v. Parke, No. 97-3743, 1998 WL 230920 (7th Cir. 1998). Both of these statements are similar to Hristov's statements that he was not sure if he needed a lawyer or not. Absent an unequivocal request for a lawyer, which he did not make, the officers were not required to cease questioning. This is a troubling situation because Hristov mentioned a lawyer four times. Better practice would have been to ask defendant to clarify. Davis, 512 U.S. at 461. Still, none of his statements constituted an unequivocal request for a lawyer. See Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (finding defendant's questions as to "whether he should get an attorney; how he could

14

get one; and how long it would take" insufficient, even in aggregate, to constitute unequivocal request for counsel).

In response to Hristov's first and second equivocal statements, Detective Cleary stated that it was "entirely up to you," DVD 19:36:57, T.4 and DVD 19:51:49, T.22; in response to Hristov's third statement, Detective Cleary explained the arraignment process to Hristov. DVD 19:56:20, T.26.  Cleary resumed questioning after each statement when Hristov did not affirmatively request a lawyer or unequivocally indicate that he wanted to stop answering questions.  I find that Hristov did not invoke his right to counsel and that the police behaved properly.

### III.  CONCLUSION

Defendant's motion to suppress the statements made during the police interrogation is **DENIED**.

 /s/PATTI B. SARIS
PATTI B. SARIS
United States District Judge