UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
―――――――――――――――――――――     )
UNITED STATES OF AMERICA        )
                                )
          v.                    )   CRIMINAL NO. 10-10056-PBS
                                )
1) Ivaylo Hristov               )
3) Vladislav Vladev             )
     a/k/a Mavro Kostas          )
                                )
          Defendants.           )
―――――――――――――――――――――     )
```

**MEMORANDUM AND ORDER**

April 14, 2011

Saris, U.S.D.J.

    After a plea colloquy pursuant to Fed. R. Crim. P. 11,
defendants Hristov and Vladev have filed motions asking this
Court to enter not guilty findings on the charges of aggravated
identity theft as contained in the relevant counts of their
indictment (Doc. Nos. 52, 53).[1]  Both argue that the Government
has not shown a factual basis to support a guilty plea to the
offense of aggravated identity theft in violation of 18 U.S.C. §
1028A(a)(1).  After a hearing and a review of the parties'
briefs, the defendants' motions are **DENIED**.

**I.  Factual Background**

---

[1] The aggravated identify theft counts are labeled in the
indictment as counts Seven, Eight, and Nine for Hristov and
Thirteen, Fourteen, and Fifteen for Vladev.

**A. Government's Proffered Facts**

The Government's proposed facts, as stated at the Rule 11 hearing, are reported here verbatim:

On December 26, 2009, a Bank of America customer attempted to use an ATM at 1093 Broadway in Saugus, MA and his card became stuck in the machine. When the customer tapped on the machine, the part of the machine where the card is inserted fell off. The customer called the police who responded to the ATM and took this piece of the machine into evidence.

Daniel Foster, Senior Investigator for Bank of America, in Westin, Florida, would testify that the seized piece of the Saugus ATM was a "skimmer" and he and other witnesses would explain that a skimmer is a device that criminals use to unlawfully procure the information contained on the magnetic strip on the back of an ATM or other access device card, such as a credit or debit card. Some skimmers, such as the one seized in Saugus, are attached as an overlay to the part of the ATM where the card is inserted and appear to be part of the ATM. When a customer inserts his or her card into the device, the skimmer records the information from the magnetic strip. That information is later transferred to the magnetic strips on other blank cards which are then used to unlawfully obtain funds from the compromised accounts.

Foster directed a Bank of America contract employee working

in the Boston area to go repair the ATM and to determine what else, if anything, had been altered on the machine. The contract employee realized that a "pin hole" camera also had been attached to the ATM. Such cameras are often used in conjunction with skimmers in order to capture the Personal Identification Number (PIN) of the cards being compromised. The camera is focused on the ATM's numeric keypad and records the customer entering his or her PIN as the card is "skimmed." No pinhole camera was recovered from the Saugus incident.

Surveillance photos were obtained from the ATM's camera for the period preceding and following the "stuck card" transaction which appeared to show the person attaching the skimmer to the ATM and a different person removing it. The photos are of Vladev and Hristov. The installation and removal of the skimming device with respect to the Saugus ATM is the basis of Count Four of the Indictment charging Hristov and Vladev with possession of device-making equipment. The government also would present surveillance photos of Vladev and Hristov installing/removing a skimmer at the Citizens Bank ATM, 371 Hancock Street, North Quincy, MA on January 6, 2010, and again on January 15, 2010, which is the basis for Counts Five and Six charging the two with possession of device-making equipment.

During the few weeks after the "stuck card" incident at the Saugus ATM, both Citizens Bank and Bank of America received

numerous calls from Massachusetts customers complaining of
unauthorized ATM transactions on their accounts with the earliest
reported suspicious transaction occurring on or about December
15, 2009.  None of the customers were missing their cards but
money was being withdrawn from their accounts.  The ATMs which
were the subject of customer complaints were located in Quincy,
Milton, Braintree, Somerville, Weymouth, Cambridge, Dorchester,
and Roslindale, MA.  Surveillance photos from the complained of
transactions showed the same three men using the ATMs at the
complained of times, the two involved in the Saugus skimmer
incident, that is, Hristov and Vladev, and a third man (later
identified as co-defendant Venkov.)

On January 27, 2010, Secret Service arranged for law
enforcement to set up surveillance in the vicinity of two
Citizens Bank ATMs which, based on the customer complaints and
surveillance photos, appeared to have been the ones most used by
the three suspects.  The ATMs were located at 420 Granite Street
in Milton, MA and 371 Hancock Street in Quincy, MA.  At the same
time, Citizens Bank fraud investigators were in the vicinity of
the 371 Hancock Street ATM in Quincy and were able to observe the
activity at that ATM, sometimes from their vantage point on the
street, as well as on a laptop computer.  Citizens Bank VP of
Internal Investigations, Bert Oliveira, was observing both ATMs
on a live feed from his computer in Chicago, IL.

At about 6:12 p.m. on January 27, 2010, Oliveira saw one of the three men he recognized from the prior surveillance photos using the ATM at 371 Hancock Street. As the transaction occurred, Oliveira was able to determine that the man was accessing a Citizens Bank account belonging to a North Quincy man and which was the account of one of the customers who had complained of unauthorized transactions. The suspect made two withdrawals, one for $100 and one for $400, and two unsuccessful attempts at withdrawals from that account. Oliveira alerted Quincy Police, who took the man into custody and identified him as Ivaylo Hristov, of Toronto, Ontario, Canada. (The withdrawal of $400 is the basis of Count Nine of the Indictment charging Hristov with aggravated identity theft.)

Hristov had six Dunkin' Donut gift cards and two American Express gift cards in his possession. The gift cards had post-it notes stuck on them with various numbers hand-written on each note. He also had $204 in his wallet and five bundles of U.S. currency in his front pocket totaling $1,380, all in $20 bills.

After being advised of his Miranda rights, Hristov made a statement. Among other things, Hristov said the following: The Dunkin' Donut gift cards and American Express gift cards in his possession were altered or forged cards and the numbers on the post-it notes were PINs for those cards. He said that the gift

cards had been encoded with the information that he or his associates had obtained using a skimming device attached to the ATM. Hristov said he was in the Boston area along with two other individuals, "Ivan," a Croation, and "Valentin," a Bulgarian, and that he did not know either of their last names. He said Ivan gave him the cards to use to withdraw money at certain ATMs. Hristov was paid 10 percent of the total amount he was able to withdraw per day and gave the rest of the money to Valentin for deposit into an account in Chicago.

When Hristov was booked, Quincy police officers also found a business card in his wallet for a storage facility in Weymouth, MA, with the number A278 written on it. On January 28, 2010, Quincy Police obtained and executed a state warrant for this storage unit. Among the items seized were a pin hole camera housing with no camera, a pen camera with the camera removed, white plastic card stock, gray paint, a knife, a chisel and a soldering tool.

After Hristov's interview, an ICE agent learned that Hristov had entered the United States through Detroit, MI, on August 22, 2009, with an individual named Anton Venkov. Secret Service then determined that an Anton Venkov had a Citizens Bank credit card and that there were charges on the card on January 27, 2010, for a Best Western motel at 891 Massachusetts Avenue in Boston, MA, and for a rental car.

Venkov was taken into custody at about 4 p.m. on January 28, 2010, by Secret Service who had located the rental car in the Best Western parking garage and saw Venkov approaching the car. After being advised of his Miranda rights, Venkov made a statement, including the following:

> On January 4, 2010, he came to the United States at the invitation of Vladev who said Venkov could make some "easy money" by "cashing out" credit cards. Vladev promised to provide food and accommodations for Venkov and told Venkov he would receive 5 percent of whatever Venkov was able to obtain with the credit cards. Venkov understood that the cards were fraudulent. Vladev drove Venkov to ATMs and only then would give Venkov one or two cards and the corresponding PINs to use to withdraw cash. Venkov said he, Vladev and Hristov were all staying at a Quincy apartment together and that Hristov also was participating in the scheme and made a higher percentage than Venkov did.

Venkov gave written permission to search his rental car. In it, the agents found two laptop computers, a GPS and $99,120 in U.S. currency in $20 denominations. Concealed in the bag of money were a driver's license, Canadian Social Security card, and a MasterCard all bearing the name of Mavro Kostas. The driver's license in the name of Mavro Kostas also had a photo- of defendant Vladev.

Venkov also told agents that Vladev was scheduled for a Lufthansa flight leaving Boston at about 4:30 p.m. that day. ICE confirmed that a Vladislav Vladev was listed as a passenger on Lufthansa Flight 423 scheduled to depart Boston's Logan airport for Frankfurt, Germany, at about 4:30 p.m. on January 28, 2010.

ICE Customs and Border Protection officers boarded the flight and took Vladev off the plane. Items seized from Vladev or from his luggage at his arrest included: the tan hooded coat he is seen wearing in some ATM surveillance photos, 6 "batteries" for skimming devices that are the same as in the skimmer seized after the Saugus incident on December 26, 2009, the rental agreement for 43 Independence Ave., Quincy, MA where all three defendants lived, Best Western note paper with handwritten notes, a new Macbook Air 13-inch computer and receipt, a new headrest monitor/DVD system with headphones, and a new Epson Stylus all-in-one printer copier and scanner.

As noted, Hristov had a number of gift cards in his possession when arrested. A search of 43 Independence Avenue, Quincy, MA, where the defendants lived, resulted in the seizure of an additional 29 gift cards. All of the cards in Hristov's possession and 26 of the additional cards seized from the apartment had been encoded with Track 2 magnetic strip information from ATM/debit cards. None of the seized cards appeared to have been encoded with Track 1 information, which would include the cardholder's name.

David Gagne, Citizens Bank Senior VP, Senior Fraud Prevention Specialist, Security & Risk, would testify that he has been in the banking industry for about 40 years, and for the last 13 years has been involved with all aspects of card-related

operations, including the last 3 years in the security and risk division responsible for card fraud and card threats. He would explain what the magnetic strip information on ATM and debit cards involves, particularly with respect to Track 2. Gagne would testify that the magnetic strip information for ATM/debit cards is composed of two tracks of information, only Track 2 of which is necessary to complete withdrawals at an ATM machine. Track 2 contains the card number which is unique for each card and which is assigned to a particular individual who is authorized to access an account or accounts to which the card is linked. Additionally, Track 2 contains a three-digit CVC code which is a calculated number based on an algorithm using the card number, the card's expiration date, and the card's service code. Based on the algorithm, only one three-digit number is the correct CVC code for that card number. The card expiration date and service code also appear on the Track 2 data. Gagne would further testify that if there were four members of a family, for example, who each had an ATM/debit card to access the same bank account, each family member would have a card with a different, unique number and a different CVC code. The PIN does not appear on the magnetic strip and is either selected by the customer or issued by the bank. The bank's computer systems connect the PIN with the magnetic strip data and both must match exactly or the transaction will be declined.

The cards seized from Hristov and from the apartment contained only Track 2 information which included the card number, service code, and the CVC code.  One of the cards had been used successfully-by Hristov- to withdraw funds just prior to his arrest.

The government also would present the testimony of a cooperating witness (CW), who would testify to the following:

> The CW was invited by Vladev to participate in the skimming operation. He observed Vladev assemble the skimming devices, with Hristov's assistance, from parts sent to Vladev in router boxes from Bulgaria. The CW estimated that he observed Vladev and Hristov assemble approximately twenty skimming devices. Vladev received all the account information that was captured on the magnetic strip in a computer file.  Vladev emailed the file to an unknown subject in Bulgaria. The unknown subject opened the file, decrypted the data and re-sent the account information to Vladev via email minus the Bulgarian unsub's percentage.

> The CW said Vladev installed the skimmers on ATMs and Hristov was the "lookout."  Hristov also retrieved the skimmer from the ATM.  Additionally, pin hole cameras were installed on the ATMs in order to capture the people entering their PINs as the magnetic strip information from the cards was being skimmed. The PINs were later matched up with the corresponding magnetic strip information.  All three defendants participated in "cashing out" the cards at ATMs.

> Hristov called Vladev when Hristov was arrested. Venkov said he and Vladev then went to a storage unit to destroy a computer, skimmers and cards. They threw the computer and cards out the car window and smashed the skimming devices. Venkov believed that Vladev had four or five skimmers that he was using in MA.

Specifically with respect to the aggravated identity theft counts, the government would present evidence of the following:

On January 18, 2010, Hristov used a counterfeit card at the
Citizens Bank ATM at 371 Hancock Street, North Quincy, MA. The
magnetic strip information on the card identified it as card
number xxxx xxxx xxxx 8332, belonging to a Quincy, MA, woman. By
entering the associated PIN, Hristov accessed her Citizens Bank
account, which she held jointly with another, and withdrew $300
from the account.  [Count Seven].  Also on January 18, 2010,
Hristov used a counterfeit card, with the magnetic strip
information identifying it as card number xxxx xxxx xxxx 2656,
and the associated PIN, to access a Citizens Bank individual
account belonging to a Braintree, MA woman, withdrawing $300.
This occurred at a Citizens Bank ATM at 420 Granite Street, in
Milton, MA.  [Count Eight].  On January 27, 2010, Hristov used a
counterfeit card at the Citizens ATM at 371 Hancock Street, North
Quincy, MA. The magnetic strip information on the card identified
it as card number xxxx xxxx xxxx 4154, which belonged to a North
Quincy man.  By entering the associated PIN, Hristov withdrew
$400 from the man's account, which he held jointly with another.
The other person on the account did not have a card issued on the
account.  [Count Nine].  Hristov was arrested shortly after using
this counterfeit card and the card was in Hristov's possession.
There are bank surveillance photos from each ATM showing Hristov
using these machines at the time that bank records show the
accounts being accessed by use of a particular card number.

On January 20, 2010, Vladev withdrew $600 from a Citizens Bank account belonging to a Milton woman using a counterfeit card encoded with the magnetic stip information identifying it as card number xxxx xxxx xxxx 5152 and by entering the associated PIN. This withdrawal occurred at the Citizens Bank ATM at 876 Main Street in Malden, MA. [Count Thirteen]. On January 25, 2010, Vladev withdrew $220 from the Citizens account belonging to a West Bridgewater woman using a counterfeit card with the magnetic strip information identifying it as card number xxxx xxxx xxxx 0050 and by entering the accompanying PIN. The withdrawal occurred at the Citizens Bank ATM at 40 Union Square, Somerville, MA. [Count Fourteen]. On January 27, 2010, Vladev used a counterfeit card encoded with the magnetic strip information identifying it as card number xxxx xxxx xxxx 8720 and entering the accompanying PIN to withdraw $600 from the Citizens account belonging to a Randolph individual. This withdrawal occurred at the Citizens ATM at 310 Grove Street in Braintree, MA. [Count Fifteen]. There are bank surveillance photos showing Vladev using the ATM at the times these accounts were accessed by use of a particular card number.

In addition to the surveillance photos of all three defendants using the ATMs while accessing various customer accounts, identified by a card number linked to the account, the government also would present significant physical evidence which

was seized from the search of three storage units (two in Venkov's name and one in Hristov's), from the Quincy apartment where all three defendants lived, and from each defendant upon his arrest. In addition to what already has been described, the government would offer evidence including: currency totaling $37,020 all in $20 denominations, white plastic card stock, the coat which appeared to be the same one Hristov was wearing in surveillance photos, handwritten "ledger" sheets itemizing the dollar amounts taken by day and indicating when the machine "took card," and Western Union receipts showing wire transfers of funds from "Mavro Kostas" to Bulgaria and from Hristov to Chicago, among other places. A forensic analysis of a 2GB thumb drive seized from the Quincy apartment contained, among other things, a programmer's manual for a magnetic stripe card reader/writer.

Bank of America suffered a loss of $33,000 with 36 compromised customer accounts. Citizens Bank suffered a loss of $91,580 with 74 compromised customer accounts. Including attempted withdrawals which were declined, the intended loss for Citizens Bank totaled $204,800. The banks absorbed the financial loss.

### B. Defendants' Version

The defendants agree with the Government's version of the facts, with the following exceptions: Both defendants dispute the amount of the loss, Vladev contends that Venkov's participation

in the scheme was not at Vladev's invitation as Venkov stated, and Hristov disagrees with the percentage that Venkov said Venkov received for participation in the scheme.  Defendants do not dispute any other facts about their conduct.

The defendants do dispute that they knew that the accounts they accessed belonged to real, actual people.  The defendants contend that based on the information derived from their skimming devices, there was no way for them to know that the information they obtained belonged to actual people rather than corporate entities or fake identities.

## II. Procedural Background

Defendants were indicted and charged with using counterfeit access devices in violation of 18 U.S.C. §§ 1029(a)(1) & (b)(1), bank fraud in violation of 18 U.S.C. § 1344, possession of device-making equipment in violation of 18 U.S.C. § 1029(a)(4), and aggravated identify theft in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4) & (c)(5).  On August 4, 2010, Vladev filed a motion to dismiss the aggravated identity theft counts, arguing that the information skimmed from the ATM bank cards was not sufficient to "identify a specific individual," as required for aggravated identity theft under 18 U.S.C. § 1028A(a)(1).  This Court, finding his arguments without merit, denied the motion to dismiss without opinion.  On September 15, 2010, Hristov filed a similar motion, along with a motion to suppress the statements he

made to the police after his arrest.  The Court denied these motions, as well.  See United States v. Hristov, Cr. No. 10-10056, 2010 WL 4449603 (D. Mass. Nov. 4, 2010).

Vladev then pled guilty to the non-aggravated identity theft counts, and offered conditional guilty pleas to the aggravated identity theft counts, in order to preserve his rights to appeal the denial of his motions to dismiss.  Hristov offered conditional guilty pleas to all charges, including the aggravated identity theft counts, in order to preserve his rights to appeal the denial of his motions to dismiss and motion to suppress.  At the plea colloquy, this Court accepted the guilty pleas from Vladev and the conditional guilty pleas from Hristov on the counterfeit access devices, bank fraud, and possession of device-making equipment charges.  However, the Court did not take pleas related to the charges of aggravated identity theft.

Rather, the defendants asked this Court to rule on whether the undisputed facts proffered by the government are sufficient to establish the crime of aggravated identify theft as defined by 18 U.S.C. §§ 1028A(a)(1), (c)(4) & (c)(5).  The defendants contended that the undisputed facts were insufficient to satisfy the knowledge requirement of the aggravated identity theft statute.  Based on the information gathered from the skimming devices, they argued, there was no way to know that the accounts they accessed belonged to real, actual people, as required by

Supreme Court case law.  See <u>Flores-Figueroa v. United States</u>, --
- U.S. ----, 129 S. Ct. 1886, 1894 (2009).

I was not convinced that I could even entertain the
defendants' requests and I refused to take pleas from either
defendant on the charges of aggravated identify theft.  Instead,
I allowed the defendants to admit to the underlying conduct
related to the charges of aggravated identify theft, and asked
the parties to provide supplemental briefing on whether I could
make such a ruling in the course of a Rule 11 hearing.  After the
colloquy, the defendants submitted motions requesting "Entry of
Not Guilty Findings" (Doc. Nos. 52, 53).  The Government opposed
these motions (Doc. No. 56).

## III. Discussion

### A. Defendants' Motion is Not Cognizable

The first question is whether a "motion for entry of
findings of not guilty" is cognizable under the Federal Rules of
Criminal Procedure.  The Court could neither find a formal rule
permitting such a motion nor any case law on point.  I conclude
that this motion is not cognizable.

The Government urges the Court to consider the defendants'
motions as implied motions to dismiss under Rule 12(b) and to
rule on the merits of the defendants' arguments.  But even
converting the motion to one under Rule 12 does not clearly
resolve the problem.  It is true that some courts allow parties

16

to request rulings of law based on undisputed facts in a criminal case under Rule 12.  See, e.g., United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986) ("A pretrial motion is generally capable of determination before trial if it involves questions of law rather than fact.") (internal quotation marks and citations omitted); United States v. Jones, 542 F.2d 661, 664 (6th Cir. 1976) (same).  Such a pre-trial ruling might similarly be allowed where the legal issues are "threshold" ones related to "double jeopardy questions, statute of limitations questions, and . . . questions of jurisdiction."  United States v. McCormack, 31 F. Supp. 2d 176, 180-81 (D. Mass. 1998).  Here, however, the defendants seek a pre-trial ruling on the merits.  I am only aware of one circuit wherein a district court can inquire into the undisputed facts to decide a motion to dismiss on the merits.  See, e.g., United States v. Levin, 973 F.2d 463, 469-70 (6th Cir. 1992) (affirming, over a strong dissent on procedural grounds, a district court's dismissal of an indictment on "undisputed extrinsic evidence").  But even in Levin, the district court made its ruling at a pre-trial hearing specifically for that purpose, and not in the course of taking a guilty plea; further, the court expressly stated that it would direct a verdict at the close of trial.  Id. at 465-66.

Moreover, other circuits have considered and rejected this

procedure. <u>See, e.g.</u>, <u>United States v. Salman</u>, 378 F.3d 1266,
1268 n.5 (11th Cir. 2004) (declining to follow <u>Levin</u> and ruling
that "dismiss[ing] an indictment as a matter of law based on
stipulated or undisputed facts" is improper under Rule 12, and
noting similar rejection of <u>Levin</u> by Third, Eighth and Ninth
Circuits). In the course of its ruling, the <u>Salman</u> court stated,
"We recognize that our system of criminal procedure may result in
legally meritless cases being sent to trial, but absent further
legislative direction, it is not for the courts to filter which
criminal cases may reach the trial stage by reviewing the
proffered evidence in advance." <u>Id.</u> at 1269; <u>see also</u> <u>Levin</u>, 973
F.2d at 472 (Martin, J. dissenting) (stating that where "the
substance of the court's action was a dismissal of the indictment
because of insufficient evidence," the court acted improperly in
dismissing because it impermissibly ignored the grand jury's
indictment). Even if the First Circuit were to follow the <u>Levin</u>
majority, however, its reasoning would not properly apply here,
as the defendants have not asked for a ruling under Rule 12.

**B. Defendants' Factual Basis Challenge is Improper**

At their Rule 11 hearing, the defendants wished to enter
(but I did not accept) conditional pleas related to aggravated
identity theft. The conditional plea provides the defendants
with "the right to have an appellate court review an adverse
determination of a specified pretrial motion." Fed. R. Crim. P.

11(a)(2). Before accepting and entering judgment on a
conditional plea, a judge must "determine that there is a factual
basis for the plea." Fed. R. Crim. P. 11(b)(3).

Some circuit courts have recognized that they have the
authority to review an unconditional plea of guilty to determine
whether there was an adequate factual basis for the plea under
Fed. R. Crim. P. 11(b)(3). See, e.g., United States v. Frook,
616 F.3d 773, 775 (8th Cir. 2010) ("If a district court accepts a
guilty plea based on a set of facts that plainly and obviously
does not constitute a federal offense, but nonetheless determines
pursuant to Rule 11(b)(3) that the defendant's conduct did
violate federal law, then there has been a violation of the Rule
11 scheme designed to ensure a knowing and voluntary plea. We
think that such an error . . . may be reviewed on direct appeal,
albeit under the narrow plain error standard when the defendant
does not object."); United States v. Baymon, 312 F.3d 725, 727-28
(5th Cir. 2002) ("[E]ven if there is an unconditional plea of
guilty or a waiver of appeal provision in a plea agreement, this
Court has the power to review if the factual basis for the plea
fails to establish an element of the offense which the defendant
pled guilty to."). These cases, however, only address the
appellate standard of review for the district court's finding of
a factual basis. They do not authorize a district court to enter
a not guilty finding based on a challenge to the factual basis,
where the defendants have both admitted to the Government's

version of the facts and proffered a guilty plea.

Moreover, defendants are asking the Court to determine the adequacy of the government's proposed facts under an improper standard. Their motions are premised on the argument that they cannot be found guilty beyond a reasonable doubt in light of their arguments about the knowledge requirement. In evaluating whether there is a factual basis for a guilty plea, however, "[t]he court need not be convinced beyond a reasonable doubt that the defendant is in fact guilty." United States v. Webb, 433 F.2d 400, 403 (1st Cir. 1970). Rather, "[t]he plea-taking court need only be persuaded that sufficient evidence exists to permit a reasonable person to reach a finding of guilt." United States v. Negron-Narvaez, 403 F.3d 33, 37 (1st Cir. 2005).

Here, the defendants' basic substantive argument is that, based on the information they obtained from the skimming devices, defendants could not have known that they were stealing from real, actual people, and as such the knowledge requirement of the statute could not be proven. See Flores-Figueroa v. United States, --- U.S. ----, 129 S.Ct. 1886, 1894 (2009) (holding that to convict of aggravated identity theft, government must prove that defendant knew that means of identification unlawfully utilized belonged to another person, as opposed to a counterfeit). The government has presented evidence that the defendants captured video of real people entering PINs into the ATMs; while defendants may not have known the names of these

people, a jury could reasonably find that they knew they were accessing accounts that belonged to actual individuals. This is all that is required to find a factual basis for a guilty plea.

Further, the defendants' requested remedy of "entry of findings of not guilty" is not procedurally proper. Even if a court found an inadequate factual basis to support the guilty plea, it would not enter "findings" of not guilty. <u>See</u> Fed. R. Crim. P. 11 advisory committee's note ("The normal consequence of a determination that there is not a factual basis for the plea would be for the court to set aside the plea and enter a <u>plea</u> of not guilty.") (emphasis added). In the event that a defendant believes there is no factual basis for his guilty plea, his remedy is to move to withdraw that plea and argue the inadequacy of the factual basis in the course of that motion. <u>See, e.g.</u>, <u>United States v. Maxwell</u>, 498 F.3d 799, 800-01 (8th Cir. 2007) (considering defendant's challenge to factual basis as a reason to withdraw a guilty plea). Where, as here, the defendants have not yet pled guilty to the aggravated identity theft counts, their proper course for challenging the factual basis for a potential plea is to plead not guilty and proceed to trial.

**ORDER**

The Court **DENIES** both defendants' motions (Doc. Nos. 52, 53).

/s/ Patti B. Saris
PATTI B. SARIS
United States District Judge

21